## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In Re: Escheatment of Matured, | : | |
| Unredeemed, and Unclaimed | : | |
| United States Savings Bonds | : | |
| with Purchasers' Addresses in the | : | |
| Commonwealth of Pennsylvania | : | |
| | : | |
| Petition of: Pennsylvania State | : | No. 486 M.D. 2017 |
| Treasurer, Joseph M. Torsella | : | Argued: April 10, 2018 |


BEFORE:   HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION BY
JUDGE COVEY                       FILED: June 26, 2018

Before this Court is the Pennsylvania State Treasurer, Joseph M. Torsella's (Treasurer) Application for Leave to Effect Service by Publication (Application) of the Treasurer's Amended Complaint (Complaint).[1] The Treasurer filed the Complaint in this Court's original jurisdiction seeking to obtain legal title to certain matured, unredeemed and unclaimed United States (U.S.) savings bonds (Bonds) by way of a valid escheatment proceeding pursuant to Section 1301.10b of The Fiscal Code (Code).[2]

---

[1] On or about November 8, 2017, the Treasurer filed his original complaint. On February 13, 2018, the Treasurer filed the Complaint.

    An Application by Pennsylvania Department of Treasury's (Department) Assistant Counsel Christopher Patrick Donahue (Donahue) For Admission Pro Hac Vice of J. Brett Milbourn (Milbourn) to practice before the Commonwealth Court of Pennsylvania in the above-captioned matter was granted by this Court on November 9, 2017. On December 14, 2017, the Department's Chief Counsel Christopher Craig (Craig) and Assistant Counsel Kathryn Cerulli Joyce entered their appearance for the Treasurer. Donahue withdrew his appearance on December 15, 2017. Craig now sponsors Milbourn.

[2] Act of April 9, 1929, P.L. 343, *as amended*, added by Section 5 of the Act of July 13, 2016, P.L. 664, 72 P.S. § 1301.10b. Sections 1301.1 through 1301.29 of the Code are commonly referred to as the Disposition of Abandoned and Unclaimed Property Act (DAUPA).

# FACTUAL BACKGROUND

In the Complaint, the Treasurer avers that he is seeking to obtain legal title to the following matured, unredeemed and unclaimed Bonds pursuant to Section 1301.10b of the Code:

12. A vast majority of the matured, unredeemed [Bonds] are Series 'E' bonds, which were first sold in 1941. Nearly 4.6 billion Series E bonds were sold in this country between 1941 and 1980. Between 1941 and November 30, 1965, Series E bonds were sold with 40-year terms. Between December 1965 and June 30, 1980, they carried 30-year terms. The last Series E bond was issued in 1980, and all such bonds had reached maturity by June 30, 2010.

13. Series A-D bonds were sold from March 1, 1935, through April 30, 1941. Series A-D bonds were sold with 10-year terms. The last of these bonds was issued in 1941, and all such bonds had reached maturity by April 30, 1951.

14. Series F and G bonds were sold from May 1, 1941, through April 30, 1952. Series F and G bonds were sold with 12-year terms. The last of these bonds was issued in 1952, and all such bonds had reached maturity by April 30, 1964.

15. Series H bonds were sold from June 1, 1952, through December 31, 1979. Between June 1, 1952 and January 31, 1957, Series H bonds were sold with terms of 29 years and 8 months. Between February 1, 1957 and December 31, 1979, they carried 30-year terms. The last Series H bond was issued in 1979, and all such bonds had reached maturity by December 31, 2009.

16. Series J and K bonds were sold from May 1, 1952, through April 30, 1957. Series J and K bonds were sold with a term of 12 years. The last of these bonds was issued in 1957, and all such bonds had reached maturity by April 30, 1969.

17. Series EE bonds were first sold in January 1980 and continue to be sold through the present. Series EE bonds

2

were originally sold with different terms but all Series EE bonds earn interest for up to 30 years. The first Series EE bond reached final maturity in January 2010.

18. Series HH bonds were sold from January 1, 1980, through August 31, 2004. Series HH bonds were sold with 20-year terms. The first Series HH bond reached final maturity and ceased earning interest in January 2000.

Complaint ¶¶ 12-18; *see also* Application ¶ 2.

Further, the Treasurer stated in his Application that the Bond purchasers/owners had last known addresses in the Commonwealth 26 to 79 years ago. *See* Application ¶ 7.

The only information currently available to the Treasurer regarding the identities and addresses of the current owners of the [Bonds] delivered to the Treasurer's office consists of the names and last known addresses of safe deposit box owners and the information on the face of the [B]onds included among the safe deposit box contents delivered to the Treasurer's office pursuant to [Sections 1301.3(4) and 1301.13 of the Code,[3]] 72 P.S. §§ 1301.3(4) and 1301.13 [(relating to delivery of abandoned or unclaimed property subject to the Commonwealth's custody and control)]. Each of the [Bonds], however, has remained unclaimed for at least six years after final maturity, and even the most recent of the [B]onds delivered to the Treasurer were issued in 1991. Accordingly, the information is outdated or generally no longer accurate. In many, if not most, cases, these [B]onds will likely have passed by inheritance or to persons other than the original owner.

Application ¶ 6.

Despite the Treasurer's efforts to locate the Bonds' owners or their heirs, the age of the Bonds as well as the deaths and relocations of their owners have resulted in many of the Bonds and, consequently, approximately $840 million, remaining unclaimed. Some of the Bonds have been repossessed by the U.S.

---

[3] Sections 1301.3 and 1301.13 of the Code were added by Section 5 of the Act of December 9, 1982, P.L. 1057.

Treasury, which has not attempted to locate the Bonds' owners or their heirs and refuses to supply information it possesses that may assist the Treasurer in locating them. Accordingly, unless an owner or heir has reason to know that the Treasurer or the U.S. Treasury possesses the Bonds, they will remain unclaimed in perpetuity. The Treasurer's purpose in taking ownership of the Bonds is so the Treasurer has more than a mere custodial interest in them, with the ultimate goal of reuniting the Bonds' proceeds with their owners or their heirs.[4]

## LEGAL BACKGROUND

Initially, Section 1301.2(a) of the Code[5] provides that "[a]ll abandoned and unclaimed property . . . is subject to the custody and control of the Commonwealth[.]" 72 P.S. § 1301.2(a). In 2016, the General Assembly enacted Section 1301.10b of the Code to specifically address U.S. savings bonds, therein declaring:

> It is the intent of the General Assembly to allow the [Treasurer] to obtain possession of unredeemed and unclaimed [U.S.] savings bonds on behalf of residents of this Commonwealth but held by the [f]ederal [g]overnment to permit and facilitate the right of Pennsylvania bond holders to be reunited with the bond holders' [U.S.] savings bonds proceeds.

72 P.S. § 1301.10b(a). Section 1301.10b(c) of the Code states, in relevant part:

> Notwithstanding any law to the contrary, [U.S.] savings bonds that are unclaimed property pursuant to [S]ection 1301.10[.1] [of the Code] shall escheat to the Commonwealth three (3) years after becoming unclaimed property by virtue of the provisions of [S]ection 1301.2 [of the Code]. All property rights and legal title to and ownership of [U.S.] savings bonds or proceeds from the

---

[4] According to the Treasurer, the interest the Bonds accrue covers the costs and fees related to the escheatment process.

[5] Added by Section 5 of the Act of December 9, 1982, P.L. 1057.

4

> bonds, including all rights, powers and privileges of survivorship of any owner, co-owner or beneficiary, shall vest solely in the Commonwealth according to procedures set forth in subsections (d) [(relating to civil action commencement)], (e) [(relating to service by publication)], (f) [(relating to escheatment judgment)], (g) [(relating to the Commonwealth's redemption process)] and (h) [(relating to the Commonwealth's duty to pay future claims)].

72 P.S. § 1301.10b(c). Despite that title to the U.S. savings bonds will be vested solely in the Commonwealth upon escheatment, Section 1301.10b(h) of the Code expressly preserves the owners/heirs' rights to claim their proceeds at any future time without limitation.[6] *See* Treasurer 2/22/18 Supp. Br. at 12.

To undertake a U.S. savings bond escheatment action, Section 1301.10b(d) of the Code specifies:

> Within one hundred eighty (180) days after becoming reportable as unclaimed property pursuant to [S]ection 1301.10[.1] [of the Code], if no claim has been filed in accordance with the provisions of [S]ection 1301.19 [of the Code] for a [U.S.] savings bond, the [Treasurer] may commence a civil action in Commonwealth Court for a determination that the [U.S.] savings bond shall escheat to the Commonwealth. . . .

72 P.S. § 1301.10b(d). Section 1301.10b(e) of the Code further directs:

> **The [Treasurer] shall make service by publication of the proceeding in accordance with [Pennsylvania Rule of Civil Procedure] No. [(Rule)] 430** (relating to Service Pursuant to Special Order of Court. Publication). In

---

[6] Section 1301.10b(h) of the Code specifies, in relevant part:

> Notwithstanding any law to the contrary, a person making a claim for [U.S.] savings bonds escheated to the Commonwealth under this section, or for the proceeds from the bonds, may file a claim with the [Treasurer]. Upon providing sufficient proof of the validity of the person's claim, the [Treasurer] shall pay the claim.

72 P.S. § 1301.10b(h).

addition, the notice shall name any known owner, co-owner or beneficiary to be served and notify the person that:

1. the person has been sued in Commonwealth Court;

2. the person shall answer the petition or other pleading or otherwise defend, on or before a specified date, not less than forty-one (41) days after the date the notice is first published; [and]

3. if the person does not answer or otherwise respond, the petition or other pleading shall be taken as true, and judgment, the nature of which shall be stated, shall be rendered accordingly.

72 P.S. § 1301.10b(e) (emphasis added).

Rule 430(a) mandates:

If service cannot be made under the applicable rule[,] the plaintiff may move the court for a special order directing the method of service. **The motion shall be accompanied by an affidavit stating the nature and extent of the investigation which has been made to determine the whereabouts of the defendant and the reasons why service cannot be made**.

Pa.R.C.P. No. 430(a) (emphasis added). The Pennsylvania Superior Court has explained:

**Due process of law requires an adequate investigation for interested parties**. Courts have repeatedly expressed the importance of proper service of process. 'Service of process by publication is an extraordinary measure and **great pains should be taken to ensure that the defendant will receive actual notice of the action against him**.' *Fusco v. Hill Fin. Sav. Ass'n,* . . . 683 A.2d 677, 680 ([Pa. Super.] 1996). 'Due process, reduced to its most elemental component, requires notice.' *PNC Bank, N.A. v. Unknown Heirs,* 929 A.2d 219, 230 (Pa. Super. 2007). . . .

As our federal courts have observed: 'Service of process is not a mere technicality. Rather, constitutional due process requires that service of process be 'reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to

6

present their objections.'' *Calabro v. Leiner,* 464 F. Supp. 2d 470, 471 (E.D. Pa. 2006) (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306 . . . (1950)). To this end, Rule 430(a) applies only where 'service cannot be made' in the normal fashion. Pa.R.C.P. No. 430(a) . . . .

*Sisson v. Stanley*, 109 A.3d 265, 270-71 (Pa. Super. 2015) (emphasis added and omitted).

Rule 430(b) provides:

(1) If service of process by publication has been authorized by rule of civil procedure or order of court, **the publication shall be by advertising a notice** of the action **once in the legal publication**, if any, designated by the court for the publication of legal notices and in **one newspaper of general circulation** within the county. **The publication shall** contain the caption of the action and the names of the parties, **state the nature of the action**, and **conclude with a notice substantially in the following form**:[7]

### NOTICE

If you wish to defend, you must enter a written appearance personally or by attorney and file your defenses or objections in writing with the court. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you without further notice for the relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

---

[7] Rule 430(b) does not specify in what manner or by how much the mandatory notice language may deviate from Rule 430(b)(1). However, it clearly requires the notice to state the nature of the action.

(NAME)
(ADDRESS)
(TELEPHONE NUMBER)

> *Note:* The office shall be that designated by the court under Rule 1018.1(c) [(relating to the form notice to defend)].
>
> (2) When service is made by publication upon the heirs and assigns of a named former owner or party in interest, the court may permit publication against the heirs or assigns generally if it is set forth in the complaint or an affidavit that they are unknown.

Pa.R.C.P. No. 430(b) (bold text emphasis added). Finally, Pennsylvania Rule of Appellate Procedure (Appellate Rule) 3709 mandates:

> Whenever a matter . . . is brought before the Commonwealth Court within its original jurisdiction, the following names and related information shall be included in the notice to defend set forth in the complaint pursuant to [Rule] 1018.1:
>
> MidPenn Legal Services
> 213-A North Front Street
> Harrisburg, Pennsylvania 17101
> (717) 232-0581
> **and**
> Dauphin County Lawyer Referral Service
> Dauphin County Bar Association
> 213 North Front Street
> Harrisburg, Pennsylvania 17101
> (717) 232-7536

Pa.R.A.P. 3709.

Ultimately, this Court may only grant the Commonwealth legal title to the Bonds if the Treasurer "has substantially complied with" Commonwealth laws. 72 P.S. § 1301.10b(f). At this stage of the proceeding, the Court must determine whether the Treasurer has satisfied the prerequisites for service by publication.

## DISCUSSION

In support of the Application, the Treasurer attached **affidavits** by Brian Munley (Munley Affidavit), Director of the Pennsylvania Department of Treasury (Department), Bureau of Unclaimed Property (Bureau), and J. Brett Milbourn, Esquire (Milbourn Affidavit), setting forth the Treasurer's efforts to reunite the Bonds with their owners/heirs, pursuant to Rule 430(a). *See* Application Ex. A. To comply with Rule 430(b), the Treasurer offered a list of **publications** in which he intends to offer public notice of this action. Finally, to satisfy Rule 430(b) and Appellate Rule 3709, the Treasurer attached to the Application a copy of the **notice** the Treasurer intends to publish (Notice).[8]

Because no Bond owner or heir has been notified, no response has been filed to the Application.

### Affidavits

The first prerequisite which must be met for service by publication is an adequate investigation by the Treasurer to determine the Bond owners' whereabouts and the reasons why regular service cannot be made. *See* Rule 430(a); *see also Sisson*. The Treasurer offered the Munley Affidavit and the Milbourn Affidavit to satisfy that requirement. Munley attested, in relevant part:

> 2. In the course and scope of my employment, I am familiar with the efforts undertaken by the [Bureau] to reunite the owners of lost, abandoned and unclaimed property with their property.
>
> . . . .
>
> 5. Further, when such property is reported and delivered to the [Bureau], we have a statutory obligation to make

---

[8] The Notice is the amended notice the Treasurer presented to this Court during the November 20, 2017 hearing, which differed from the notice attached to the Application. This decision is based upon the amended notice.

9

reasonable efforts to notify owners of unclaimed property and reunite them with their missing property. 72 P.S. § 1301.12.

6. The [Bureau] undertakes the following efforts to notify owners of unclaimed property and reunite them with their missing property, including unclaimed savings bonds:

a. Publishing notice 'at least once in a legal newspaper as well as an English language newspaper of general circulation in the county in which the owner of the property had a last known address.' 72 P.S. § 1301.12(a)[.]

b. Publishing information about unclaimed property in a searchable form on the website of the [Department], located at http://www.patreasury.gov/claim, which provides access to a database that allows the public to search for unclaimed property and submit claim forms to the [Bureau]. 72 P.S. § 1301.12(a). If a person types a name (*e.g.*[,] last name, corporate name, etc.) into this search engine, the search will generate a result as to whether any property is held in that name according to the records received and maintained by the [Department].

c. Further notice is provided through radio and television interviews, news releases, news conferences, social media and media events informing Pennsylvania citizens that they can search for and claim unclaimed property by contacting the [Bureau] on its website or by phone.

7. When potential owners, heirs or assigns are located, claim packets are sent to such persons informing them of the existence of the unclaimed property that has been turned over to the [Bureau] and of the fact that they may – at no expense – file a claim to that property.

8. In addition to the above-described efforts, legal counsel for the [s]tate of Pennsylvania has undertaken additional and extensive efforts – including, but not limited to, the use of TLO Online Investigative Systems[9] and additional

---

[9] TLO is not defined in this record.

10

internet-based searches when multiple addresses were found and/or similar names appeared connected to an updated address – to locate and reunite the original [B]ond owners with all of the unclaimed [Bonds] that have been turned over to the [Bureau] and which are subject to escheatment pursuant to [Section 1301.10b of the Code]. These additional search efforts were made with respect to both the bonds currently in the possession of the [Bureau,] as well as the [B]onds that the [Bureau] sent back to the U.S. Treasury at the U.S. Treasury's request prior to 2002.

Munley Affidavit at 1-3.

Milbourn attested, in pertinent part:

3. The affiant incorporates by reference Exhibit 1, which lists the 5,289 defendants on whom service by publication is sought whose names are known but whose current residences are unknown after diligent search and inquiry to ascertain the same.

4. Reasonable, good faith efforts were taken to ascertain the residences of these defendants, including the following:

. . . .

c. In 2002, all unclaimed [Bonds] delivered to the [Bureau] prior to 2002 (that were not reunited with their owners) were sent back to the U.S. Treasury at its request. By taking these [B]onds, the U.S. Treasury has retained the entirety of the cash proceeds and is now also in possession of the physical bonds ('Bonds Repossessed by U.S. Treasury'). Thus, the original owners of these bonds have almost no chance of ever recovering the proceeds. However, the [Bureau] retained records of the apparent owners' contact information that either appeared on the face of many of the Bonds Repossessed by U.S. Treasury or was reported by the holder when delivering the contents of safe[]deposit boxes to the Department.

d. The spreadsheet attached to the [Complaint] as Exhibit B-1 compiles name-and-address information for the owners of the 8,418 matured, unredeemed Bonds Repossessed by U.S. Treasury that are

11

Pennsylvania Unclaimed U.S. Savings Bonds and therefore subject to escheat[ment] to the [s]tate of Pennsylvania pursuant to [Section 1301.10b of the Code], with a total 'face' value at $629,459.00 and a total 'matured' value of $3,009,518.47.

e. Since 2002, the [Bureau] has retained possession of all unclaimed [Bonds] delivered to the [Department] pursuant to the [Code] that have not been reunited with their owners (the 'Bonds in Possession').

f. The spreadsheet attached to the [Complaint] as Exhibit A-1 compiles name-and-address information for the owners of the 9,800 matured, unredeemed Bonds in Possession that are Pennsylvania Unclaimed U.S. Savings Bonds and therefore subject to escheat[ment] to the [s]tate of Pennsylvania pursuant to [Section 1301.10b of the Code], with a total 'face' value at $1,084,215.00 and a total 'matured' value of $5,597,000.55.

g. With regard to both the Bonds in Possession and the Bonds Repossessed by U.S. Treasury that have not been reunited with their owners as described above, the Treasurer is left with only the contact information appearing on the faces of the bonds or the information reported by the holder. That name-and-address information, however, is consistently outdated, owing to the long maturities of [Bonds] and the extended periods in which these [Bonds] have remained unclaimed in safe deposit boxes.

h. In an effort to confirm or obtain more up-to-date addresses for the owners of the 9,800 Bonds in Possession, the [Bureau] sorted through all available information, culling out duplicate entries and successfully compiling a list of 2,662 individuals in whose names these 9,800 bonds were originally purchased.

i. Affiant's staff then searched each of those 2,662 names using TLO Online Investigative Systems, a comprehensive online database of public and proprietary records (including, but not limited to, telephone directories, employment records, motor

12

vehicle records, property records and court records) widely recognized as a leader in the identity-search field. In addition, affiant's staff undertook further internet-based searches when multiple addresses were found and/or similar names appeared connected to an updated address. Using TLO and the additional searches above, affiant's staff obtained what were believed to be the best and only available, potentially current addresses for 872 of the 2,662 individuals searched. These 872 individual owners accounted for 2,236 Bonds in Possession, with a 'face' value totaling $177,735.00 and a 'matured' value of $798,654.11.

k. Affiant's office then sent the above 872 individuals and their potentially current and valid mailing addresses back to [the Bureau] to again specifically review and further verify using the process set out in the [Munley Affidavit] . . . .

1. The Treasurer, in turn, sent notice correspondence to those individuals whose addresses and whereabouts could be verified, informing the recipients that the Treasurer is in possession of their bonds, and further advising how such bonds could be redeemed. *See Sample Notice Letter*, attached to the Application as Exhibit C. To date, multiple individuals have responded to those mailings and come forward to claim their bonds.

m. To the extent that any additional claims to the Bonds in Possession are received during the publication period and subsequently verified, such bonds will be delivered over to those claimants.

n. The searches for the remaining 1,790 individuals, who account for the remaining 7,564 Bonds in Possession, resulted in outdated, incorrect, unusable addresses and name information that could not be used to locate such individuals. Thus, the residences of these individuals were, after diligent search and inquiry, unable to be discovered and their whereabouts are unknown and cannot with reasonable diligence be discovered under the facts and circumstances of this case. The face value of

13

these remaining Bonds in Possession is $906,480.00 and the matured value of such bonds is $4,798,346.44. *See* Spreadsheet attached to the [Complaint] as Exhibit A-2.

o. In an effort to confirm or obtain more up-to-date addresses for the owners of the Bonds Repossessed by U.S. Treasury, the Bureau sorted through the information available to the Treasurer, culling out duplicate entries and successfully compiling a list of 4,345 individuals in whose names these 8,418 bonds were originally purchased.

p. Affiant's staff then searched each of those 4,345 names using TLO Online Investigative Systems, a comprehensive online database of public and proprietary records (including, but not limited to, telephone directories, employment records, motor vehicle records, property records and court records) widely recognized as a leader in the identity-search field. In addition, affiant's staff undertook further internet-based searches when multiple addresses were found and/or similar names appeared connected to an updated address.

q. Using TLO and the additional searches above, affiant's staff successfully made contact with 848 of the 4,345 individuals searched. These individuals were given instructions on how to reach the U.S. Treasury for information on having their bonds redeemed or re-issued. These 848 individual owners accounted for 1,225 bonds with a 'face' value totaling $53,800.00 and a 'matured' value of $279,930,38.

r. The searches for the remaining 3,497 individuals, who account for the remaining 7,193 Bonds Repossessed by U.S. Treasury, resulted in outdated, incorrect, unusable addresses and name information that could not be used to locate such individuals. Thus, [the] residences of these individuals were, after diligent search and inquiry, unable to be discovered and their whereabouts are simply unknown and cannot with reasonable diligence be discovered under the facts and circumstances of this

14

case. The face value of the remaining Bonds Repossessed by U.S. Treasury is $575,650.00 and the matured value of such bonds is $2,729,588.09. *See* Spreadsheet attached to the [Complaint] as Exhibit B-2.

5. For these reasons, diligent search and inquiry have been made to discover the residences of the apparent owners of the remaining Bonds in Possession and Bonds Repossessed by U.S. Treasury and return their property to them. Despite such diligent search and inquiry, however, the residences of the apparent owners of the remaining Bonds in Possession and Bonds Repossessed by U.S. Treasury, which are listed on Exhibits A-2 and B-2 attached to the [Complaint], are unknown to the affiant and the Treasurer.

6. The Treasurer has also made reasonable but unsuccessful efforts to ascertain the names and residences of the apparent owners of the Pennsylvania Unclaimed U.S. Savings Bonds that are lost, stolen, abandoned, voluntarily relinquished, or destroyed (the 'Absent Bonds') and who are therefore sought to be served as unknown defendants, as follows:

a. On December 22, 2016, in an effort to obtain information regarding the identity and contact information for the apparent owners of the Absent Bonds whose matured but unredeemed bonds have not been turned over to the Department, I, in my capacity as co-counsel for the Treasurer, sent the [Freedom of Information Act (]FOIA[)]-request letter attached to the Application as Exhibit D, to the [Department's] Bureau of the Fiscal Service.

b. Similarly, on December 22, 2016, I, in my capacity as co-counsel for the Treasurer, sent the letter attached to the Application as Exhibit E, to David Lebryk, Fiscal Assistant Secretary and Sheryl Morrow, Commissioner of the Bureau of the Fiscal Service.

c. Both of those letters requested access to records 'that would provide information regarding unclaimed bonds issued to bondholders with last known addresses in the [s]tate of Pennsylvania.'

15

d. On or about January 9, 2017, I received the denial letter attached to the Application as Exhibit F, explaining that the U.S. Treasury and Bureau of the Fiscal Service are 'withholding records of individual bondholders' because, under the authority of the [FOIA], they do not release individual records to third parties.

e. The [U.S. Treasury] and the Bureau of the Fiscal Service are the only entities that have access to information concerning the owners of the Absent Bonds, and – consistent with those agencies' policies of dealing only with title-holders – those entities have refused to provide such information to the Treasurer. As a result, there is no method by which the Treasurer can conduct a search for the names and addresses of the unknown owners of the Absent Bonds, such that personal service could be effectuated.

7. For these reasons, affiant believes that there are persons who are or may be interested in the subject matter of this action whose names, after diligent search and inquiry, are unknown to the affiant. More specifically, after diligent search and inquiry has been made, the names of the defendants who are or may be interested in the Absent Bonds are unknown to the affiant and, further, it is unknown whether any such persons may claim as heirs, devisees, grantees, assignees, lienors, creditors, trustees or other claimants, either by, through or against any known person who is dead or not known to be dead or alive, or otherwise as the case may be.

Milbourn Affidavit at 2-10 (original bold emphasis omitted).

Based upon the foregoing, this Court holds that the Treasurer adequately investigated the Bond owners' whereabouts and sufficiently demonstrated why regular service cannot be made.

**Publications**

Pursuant to Rule 430(b), the Treasurer must publish notice of the action once in a legal publication and once in a newspaper of general county circulation. In the Complaint, the Treasurer asserts:

> [The] Notice [is] to be published in the *Dauphin County Reporter* and the *Harrisburg Patriot-News* pursuant to Pennsylvania law in order to effect service in this escheat[ment] proceeding upon the apparent owners identified on the face of the Bonds in Possession and Bonds Repossessed by U.S. Treasury who have not been located, as well as all unknown apparent owners of the Absent Bonds. 72 P.S. § 1301.10b(e); [Rule] 430(b). Although not required by law, counsel for the Treasurer will also publish [the] Notice for additional, [3 to 4] successive weeks in the *Allentown Morning Call*, the *Altoona Mirror*, the *Bradford Era*, the *Centre Daily Times*, the *Erie Times-News*, *the Harrisburg Patriot-News*, the *Johnstown Tribune-Democrat*, the *LNP Media*, the *Oil City Derrick/Franklin News Herald*, the *Philadelphia Inquirer*, the *Pittsburgh Post-Gazette*, the *Reading Eagle*, the *Scranton Times-Tribune*, the *Sunbury Daily Item*, the *Washington Observer-Reporter*, the *Williamsport Sun-Gazette*, and the *York Record-Dispatch*, in order to provide more extensive notice and, hopefully, reunite more Pennsylvanians with their unclaimed property. Finally, the Treasurer will also post the Notice on the [Department's] website to provide further notice regarding the [Bonds].

Complaint ¶ 29. At the November 20, 2017 hearing, the Treasurer amended the publication list, adding the *Wilkes-Barre Citizens Voice*, the *Hazleton Standard-Speaker* and the *Pottsville Republican Herald* to its proposed publication list.

Notice publication once in the *Dauphin County Reporter* and the *Harrisburg Patriot-News* satisfies Rule 430(b)'s publication requirements. Certainly, the Treasurer's proposal to publish notice in all of the aforementioned newspapers for three to four weeks, will more than satisfy the notice publication requirements.

17

**Notice**

Next, this Court must determine if the Treasurer's proposed Notice meets the requirements of Rule 430(b) and Appellate Rule 3709. In addition to the caption, the parties' names and the Rule 430(b)(1) language, the Treasurer must ensure that the "[t]**he publication shall** . . . **state the nature of the action**[.]" Rule 430(b)(1) (emphasis added).

The Treasurer's Notice states:

To the below list of owners of unclaimed [U.S.] [S]avings [B]onds (series A th[r]ough H, J, K, EE, HH) that matured on or before June 30, 2011, that were previously turned over to the Pennsylvania State Treasurer's Office, and that either remain in its possession or were sent back to the U.S. Treasury [Department]; and, to the class of all unknown owners of certain [U.S.] [S]avings [B]onds that have reached their final maturity date and remain unredeemed, that have been lost, stolen, destroyed or relinquished by the owner, that have owners with last known addresses in the [s]tate of Pennsylvania according to the records of the U.S. Treasury Department, and that were issued during the following timeframes:

a. 40-year Series E bonds issued between 1941 and November 30, 1965;

b. 30-year Series E bonds issued between December 1965 and November 30, 1979;

c. Series A, B, C, D, F, G, J and K bonds (all of which were issued prior to 1958);

d. Series H bonds issued between June 1, 1952 and November 10, 1979;

e. Series HH bonds issued between January 1, 1980 and November 30, 1989;

and to all other concerned persons having or claiming to have any right, title or interest in the property herein described,

You are notified that such property has been presumed to be abandoned. You are further notified that a Complaint pursuant to []Pennsylvania's Disposition of Abandoned and Unclaimed Property Act [(DAUPA)], . . . and identifying you as an owner has been filed by the state of Pennsylvania in the Commonwealth Court of Pennsylvania, seeking a declaration that title to the above-described U.S. [S]avings [B]onds has passed to the state of Pennsylvania by way of escheat[ment] pursuant to [Section 1301.10b(d) of the Code].

There are hundreds of millions of dollars in matured U.S. Savings Bonds which were issued to Pennsylvania citizens decades ago, most of which have become abandoned, lost, stolen, destroyed or relinquished. The U.S. Treasury [Department] continues to hold the proceeds of these bonds (and with respect to the [U.S. Savings B]onds the Pennsylvania State Treasurer's Office sent back to the U.S. Treasury [Department], [the U.S.] Treasury [Department] holds the physical bonds themselves) while making little to no effort to seek out the owners and return the proceeds. To address this inequity, the Pennsylvania legislature passed legislation to allow the [s]tate of Pennsylvania to take title to unclaimed and abandoned U.S. Savings Bonds by a process known as title-based escheatment. The new law also provides a process for persons to file a claim for the proceeds from these bonds after redemption by the state occurs. For further information about this lawsuit, visit http://www.patreasury.gov/claim. The Pennsylvania State Treasurer's Bureau of Unclaimed Property is taking steps to recover the proceeds from these abandoned, lost, stolen, destroyed, relinquished, and unclaimed mature U.S. Savings Bonds. If, however, your name appears on the list below, or you have a mature and unredeemed U.S. Savings Bond described in this notice, contact [insert number] for additional information on redeeming the [U.S. Savings B]ond or if you desire to keep legal title to the [U.S. Savings B]ond.[]

You are hereby required to answer the Complaint or other pleading in the Commonwealth Court of Pennsylvania, Pennsylvania Judicial Center, 601 Commonwealth Avenue, P.O. Box 69185, Harrisburg, Pennsylvania 69185, not later than _____ __, 201[_]. If you fail to answer or otherwise defend, the pleadings will be taken as true, and judgment

will be rendered the nature of which will be stated and may include a declaration that title to the above-described U.S. [S]avings [B]onds has passed to the state of Pennsylvania by way of escheat[ment]. You are further notified that on _____, 201[_], at ___ _.m., a hearing will be held at which time the Court will determine whether the above-referenced [U.S. S]avings [B]onds shall escheat to the [s]tate of Pennsylvania.

## NOTICE

If you wish to defend, you must enter a written appearance personally or by attorney and file your defenses or objections in writing with the court. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you without further notice for the relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

Dauphin County Lawyer Referral Service
213 North Front Street
Harrisburg, PA 17101
(717) 232-7536

Notice.

Based upon this Court's review of the Notice, the Notice suffers from the following facial infirmities:

1. The Notice represents in its opening paragraph that the Complaint relates to "[S]eries A th[r]ough H, J, K, EE, HH." Notice at 1. However, the Bonds listed thereafter are Series A, B, C, D, F, G, J and K, E, H and HH, and do not reference EE bonds.

2. The Bonds listed in the Notice differ from the Bonds the Treasurer designated in the Complaint (*see* ¶ 54) and the Application (*see* ¶ 54).

3. The Notice lacks the required MidPenn Legal Services contact information.

4. The Notice does not contain a telephone number to obtain additional information about redeeming the Bonds.

Moreover, the Treasurer seeks to obtain legal title to the Bonds by way of an escheatment proceeding for the purpose of "reunit[ing]" the Bonds with their owners or the owners' heirs.[10]   72 P.S. § 1301.10b(a).   Section 1301.10b(d) of the Code provides, in relevant part: "[T]he State Treasurer may commence a civil action in Commonwealth Court for a determination that the [Bonds] shall escheat to the Commonwealth."[11]   72 P.S. § 1301.10b(d).

The General Assembly and the Treasurer intend the Bond escheatment action to be in rem against the Bonds, as opposed to in personam against the owners or their heirs.[12]   The Pennsylvania Supreme Court has described that a "judicial

---

[10] Section 1301.10b(a) of the Code provides:

> It is the intent of the General Assembly to allow the [Treasurer] to obtain possession of unredeemed and unclaimed United States savings bonds on behalf of residents of this Commonwealth but held by the [f]ederal [g]overnment to permit and facilitate the right of Pennsylvania bond holders to be reunited with the bond holders' [U.S.] [S]avings [B]onds proceeds.

72 P.S. § 1301.10b(a).

[11] DAUPA's provisions are, in nearly every respect, custodial in nature (*i.e.*, the Commonwealth does not acquire title to property, but rather holds it in perpetuity and the owner can reclaim it at any time), and the Commonwealth's rights are merely derivative of the abandoned property's owner.  *See Delaware Cty. v. First Union Corp.*, 992 A.2d 112 (Pa. 2010).  In contrast, by the escheatment process, the Commonwealth takes legal title to and, thus, ownership (rather than mere custody) of the Bonds.  *See id.*; *see also Laturner v. United States*, 133 Fed.Cl. 47 (Fed. Cl. 2017), *motion to certify appeal granted*, 135 Fed.Cl. 501 (Fed. Cl. 2017).

[12] The Treasurer's counsel represented at the April 10, 2018 argument before this Court that such action is at all times in rem.  The Treasurer also stated in his February 22, 2018 Supplemental

21

procedure, the object of which is to subject the res to the power of the state directly by the judgment or decree" is a proceeding in rem, "and a procedure which only affects or disposes of the res by compelling a party . . . to control or dispose of the res in accordance with the mandate or decr[ee]" is in personam. *Atl. Seaboard Nat. Gas Co. v. Whitten*, 173 A. 305, 307 (Pa. 1934). More specifically, "[*i*]*n rem* actions generally are instituted to determine the status of property, and the rights of individuals with respect thereto[.]" *Commonwealth v. All That Certain Lot or Parcel of Land Located at 605 Univ. Drive*, 104 A.3d 411, 423 (Pa. 2014). Accordingly, the General Assembly and the Treasurer correctly intend that the Bond escheatment proceeding is in rem.

In 2017, in an effort to reunite the Bonds with owners whose last known addresses were on record, the Treasurer distributed the following letter to potential claimants:

> Dear Claimant:
>
> I am excited to inform you that you have been identified as a possible owner of one or more [U.S.] [S]avings [B]onds currently being held by the Pennsylvania Treasury Department, Bureau of Unclaimed Property ('Pennsylvania Treasury').
>
> Under Pennsylvania law, [U.S.] [S]avings [B]onds that have been lost or abandoned and contain owner addresses linked to Pennsylvania are sent to Pennsylvania Treasury for safekeeping. **It is my job as [Treasurer] to safeguard these bonds until we locate the owners and reunite them with their property.** Employees within Pennsylvania Treasury, along with a law firm we hired to assist with research, have been working diligently to locate current addresses for bonds owners.

---

Brief that the Commonwealth's Bond escheatment process is an in rem proceeding. *See* Treasurer 2/22/18 Supp. Br. at 13.

> Our research indicates that you may be the named owner of one or more savings bonds being held by Pennsylvania Treasury. **If indeed you believe that you are the proper owner and would like to submit a claim, we have enclosed a claim form along with instructions to enable you to submit a claim to Pennsylvania Treasury.** All claim forms should be returned to: Commonwealth of Pennsylvania Treasury Department, Bureau of Unclaimed Property, P.O. Box 1837, Harrisburg, Pennsylvania 17105-1837. Pennsylvania Treasury staff will contact you should any additional information be needed to complete the processing of your claim.
>
> For additional information, please visit our website at www.patreasury.gov where you can find frequently asked questions regarding the claims process or call us at 1-800-222-2046. The Pennsylvania Treasury Department is here to serve you, and we thank you for the opportunity to do so.

Application Ex. C at 1 (emphasis added). The letter clearly reflects that the Treasurer is holding the Bonds until they are claimed and that the owners' rights, money and property are not affected thereby. Although some Bonds were successfully reunited with their owners or their heirs, a significant majority of the Bonds remain unclaimed.[13] The Treasurer maintains that the only way he can continue the reunion process is to obtain legal title to the Bonds and retrieve the Bonds from the U.S. Treasury Department.

The General Assembly has declared that this Court may only grant the Commonwealth legal title to the Bonds if the Treasurer "has substantially complied with" Commonwealth laws. 72 P.S. § 1301.10b(f). Section 1301.10b(e) of the Code requires that the published notice "**shall** name any known owner . . . or beneficiary . . . and **notify the person that** . . . **the person has been sued** [and,] . . . **if the person does not answer** . . . , . . . **judgment** . . . **shall be rendered** . . . ." 72 P.S. § 1301.10b(e) (emphasis added). Although that portion of Section 1301.10b(e) of the

---

[13] A significant majority of the Bonds remain unclaimed because the Treasurer does not have valid owner names and/or addresses.

23

Code does not specify that judgment will be rendered *against the person*, the General Assembly further directs in Section 1301.10b(e) of the Code that the published notice shall be substantially in the form set forth in Rule 430(b)(1), which includes language that the person must enter an appearance and file written defenses and, if he or she fails to do so, "**a judgment may be entered against <u>you</u> without further notice . . . . You may lose money or property or other rights important to <u>you</u>. <u>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE</u>.**" Pa.R.C.P. No. 430(b)(1) (bold text and underline emphasis added). This language is certainly appropriate when notifying someone of a civil lawsuit against the individual (the purpose of Rule 430(b)(1)); however, it is inaccurate and misleading in the bond escheatment process now before this Court.

Notwithstanding, in order to substantially comply with the Code to obtain service by publication for an in rem proceeding, the Treasurer has no choice but to name Bond owners as defendants in the legal action and declare that if they fail to respond in some capacity, **judgment will be entered against *them*.** *See* Section 1301.10b(e) of the Code; *see also* Rule 430(b)(1). As a result, unsuspecting Bond owners or their heirs are led to believe that they require legal counsel, may incur legal expenses, will have judgment entered against them (that may remain on their records in perpetuity),[14] and/or will forever lose their Bond claim rights once escheatment occurs.[15] Despite that the Treasurer's Notice contains some explanation of the legal

---

[14] Having judgment entered against the Bond owners and/or their heirs could potentially pose an issue if any future lien searches are conducted in their names.

[15] Section 1301.10b(h) of the Code states, in relevant part:

> Notwithstanding any law to the contrary, a person making a claim for [U.S.] [S]avings [B]onds escheated to the Commonwealth under this section, or for the proceeds from the bonds, may file a claim with the [] Treasurer. Upon providing sufficient proof of the validity of the person's claim, the [] Treasurer shall pay the claim.

fiction (*i.e.*, that the Commonwealth will possess legal title to the Bonds, but it is more like protective custody since the Commonwealth will relinquish title to anyone who can thereafter prove ownership), if used as written, the boilerplate Rule 430(b)(1) notification will lead even those owners who take the time to read it and/or the applicable Code provisions to believe that they are at risk of losing their rights, money or property, require legal counsel, may incur legal expenses, will have judgment entered against them, and/or will forever lose their Bond claim rights once escheatment occurs.

According to the Treasurer, similar savings bond escheatment legislation has been enacted in 21 states,[16] and 11 of them have completed the escheatment process.[17] Notably, the Louisiana and South Dakota escheatment statutes contain nearly identical language to Section 1301.10b(e) of the Code (*i.e.*, that service by publication shall include notification that the bond owner has been sued and shall answer the complaint or appropriate judgment will be entered). However, rather than mandating a boilerplate Rule 430(b)(1)-type notification be included for service by publication, Louisiana more appropriately requires the advertisement "be in **a form that, in the judgment of the administrator, is likely to attract the attention of the apparent owner of the unclaimed property**[,]" and include the name and last known address, "[a] statement explaining that **property** of the owner is presumed to

---

72 P.S. § 1301.10b(h). Thus, although Section 1301.10(h) of the Code specifies that the Bond owners or their heirs may at any future time claim their Bond proceeds, the Rule 430(b)(1) notice says otherwise.

[16] The 21 states include: "Kansas, Ohio, Missouri, Iowa, North Carolina, Indiana, Arkansas, Georgia, Florida, South Dakota, Louisiana, Kentucky, Mississippi, South Carolina, New Hampshire, Maine, Illinois, Wisconsin, Pennsylvania, Rhode Island and Tennessee." Treasurer 2/22/18 Supp. Br. at 2 n.1.

J. Brett Milbourn represented at the November 20, 2017 hearing and the April 10, 2018 argument before this Court that he assisted the Pennsylvania General Assembly in crafting the Bond escheatment legislation, as he did in all of the other states.

[17] Those states are: "Kansas, South Dakota, Kentucky, Ohio, Indiana, Florida, South Carolina, Louisiana, Mississippi, Arkansas and Missouri." Treasurer 2/22/18 Supp. Br. at 2 n.2.

be abandoned and **has been taken into the protective custody** of the administrator[, and] [a] **statement that information** about the property and its return . . . **is available** . . . **upon request** to the administrator." La. Stat. Ann. § 9:16.A (emphasis added). South Dakota law requires, in relevant part: "[A] notice generally stating the object of the action[,] briefly describing any property affected thereby and **stating that no personal claim is made against such defendant**. **No costs shall be taxed or money judgment taken against such defendant** unless he defends the action." S.D. Codified Laws § 15-9-6 (emphasis added). Accordingly, despite having nearly identical laws, neither Louisiana nor South Dakota warn the Bond owner, as Pennsylvania does, that he/she will have judgment entered against *him/her* or *he/she will lose money or property* if he/she fails to take immediate legal action.

Therefore, even if/when the Treasurer corrects the Notice's facial infirmities, "substantially compl[ying] with" Section 1301.10b(e) of the Code, Section 1301.10b(f) nevertheless requires the Treasurer to include the Rule 430(b)(1) notification and, thus, the threat of personal judgment *against the Bond owners or their heirs*.[18] Under these circumstances, rather than simply "determin[ing] the status of [the Bonds], and the rights of [their owners] with respect thereto[,]" *Land Located at 605 Univ. Drive*, 104 A.3d at 423, the Treasurer's action mandates the owners to control and/or dispose of the Bonds and, thus, the action is in personam. *See Atl. Seaboard Nat. Gas Co.*

In order for the parties being served by publication to determine whether and how to defend the action, they must be given an accurate representation of the proceeding about which they are being notified. Although the Treasurer's Notice will inform the Bond owners or their heirs that the escheatment action has been

---

[18] Consequently, the General Assembly's statutory procedure will more than likely have a chilling effect, and its purpose of reuniting the Bonds with their owners or heirs would hardly be served.

26

undertaken, and there remains "a process for persons to file a claim for the proceeds from these bonds after redemption by the state occurs", Notice, when Rule 430(b)(1)'s contradictory language is included therein, the Treasurer's Notice no longer accurately "state[s] the nature of the action" or the Bond owners'/heirs' rights. Pa.R.C.P. No. 430(b)(1). Our Supreme Court has ruled that "inaccurate notice is as misleading . . . as lack of notice." *Commonwealth v. Horner*, 296 A.2d 760, 762 (Pa. 1972); *see also James F. Oakley, Inc. v. Sch. Dist. of Phila.*, 346 A.2d 765 (Pa. 1975). Under circumstances in which the Treasurer is required to give the Bond owners or their heirs accurate notice of the nature of the action and their rights using language substantially in the Rule 430(b)(1) form, unless the Treasurer modifies the Notice to correct the internal inconsistencies that will be created by Rule 430(b)(1)'s application in this particular circumstance, this Court will again be compelled to deny the Application even if the Notice's facial defects are corrected.[19]

---

[19] This Court prefers not to delay these proceedings while the General Assembly modifies Section 1301.10b of the Code, however, it is obligated to strictly interpret Section 1301.10b of the Code, and bring to the Treasurer and the General Assembly's attention a problem either not foreseen or overlooked when the law was enacted. In this manner, the Court is satisfying a duty committed exclusively to it by our system of checks and balances in interpreting and applying the law. *See Patchak v. Zinke*, 138 S.Ct 897 (2018); *see also Zauflik v. Pennsbury Sch. Dist.*, 104 A.3d 1096, 1129 (Pa. 2014) ("'[J]udicial' acts are those which determine the existing law in relation to existing facts, and which apply the law to the subject matter before the court[.]"); *Markham v. Wolf*, 147 A.3d 1259, 1277 (Pa. Cmwlth. 2016) ("Interpretation of official language to determine the legal effects of the language is a judicial function.").

This Court acknowledges that since Rule 430(b)(1) mandates that the Treasurer's Notice "shall contain . . . a notice **substantially** in the [specified] form[,]" the Treasurer may modify the Rule 430(b)(1) language to *some* degree. Pa.R.C.P. No. 430(b)(1) (emphasis added). Rule 430(b)(1) does not define "substantially," but *Merriam-Webster's Collegiate Dictionary* (11th ed. 2004) defines the term as "being largely but not wholly that which is specified." *Id.* at 1245. Accordingly, the Treasurer may amend his Notice so it accurately reflects the Code while still substantially being in the form specified by Rule 430(b)(1).

Otherwise, unless and until the General Assembly amends Section 1301.10b(e) of the Code so that Bond owners or their heirs understand that the bond escheatment process is against the Bonds (and they will not personally lose their rights, money and/or property), and either removes the Rule 430(b)(1) language requirement or creates a notice specific to bond escheatment actions, Bond owners or their heirs will not have accurate notice of the nature of the action and their rights.

## CONCLUSION

After considering the Treasurer's submissions, the arguments presented, and relevant law, in light of the Notice's infirmities, this Court is constrained to deny the Application pending the Treasurer's modifications consistent with this opinion.

_____
ANNE E. COVEY, Judge

---

On May 8, 2018, the Treasurer filed an Application for Special Relief in the Nature of a Request for Expedited Consideration. On May 29, 2018, the Treasurer filed an Amended Application for Special Relief in the Nature of a Request for Expedited Consideration. On June 12, 2018, the Treasurer filed a Second Amended Application for Relief in the Nature of a Request for Expedited Consideration. Based on this Court's disposition, the Treasurer's Second Amended Application for Special Relief in the Nature of a Request for Expedited Consideration is moot.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Escheatment of Matured, :
Unredeemed, and Unclaimed :
United States Savings Bonds :
with Purchasers' Addresses in the :
Commonwealth of Pennsylvania :
 :
Petition of: Pennsylvania State : No. 486 M.D. 2017
Treasurer, Joseph M. Torsella :

## O R D E R

AND NOW, this 26th day of June, 2018, the Pennsylvania State Treasurer, Joseph M. Torsella's (Treasurer) Application for Leave to Effect Service by Publication is DENIED without prejudice.

The Treasurer's Second Amended Application for Special Relief in the Nature of a Request for Expedited Consideration is MOOT.

_____
ANNE E. COVEY, Judge